1

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF IOWA
2                        CENTRAL DIVISION

3
    - - - - - - - - - - - - X
4   UNITED STATES OF AMERICA, :
                              :
5        Plaintiff,           :
                              :
6   vs.                       :     Case No. 4:23-cr-103
                              :
7   ARMANI EUGENE GATES,      :     TRANSCRIPT OF SENTENCING
                              :
8        Defendant.           :
    - - - - - - - - - - - - X
9

10                           Courtroom 265, Second Floor
                             U.S. Courthouse
11                           123 East Walnut Street
                             Des Moines, Iowa
12                           April 4, 2024
                             10:33 a.m.
13

14  BEFORE:  THE HONORABLE STEPHEN H. LOCHER, District Judge

15
    APPEARANCES:
16
    For the Plaintiff:       KRISTIN M. HERRERA, ESQ.
17                           United States Attorney's Office
                             210 Walnut Street, Suite 455
18                           Des Moines, IA  50309

19  For the Defendant:       F. MONTGOMERY BROWN, ESQ.
                             F. Montgomery Brown Law Firm, P.L.C.
20                           1001 Office Park Road, Suite 108
                             West Des Moines, IA  50265
21

22                  TONYA R. GERKE, CSR, RDR, CRR
23                    United States Courthouse
                   123 East Walnut Street, Room 197
24                     Des Moines, IA 50309

25
```

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  Good morning.

3          We're convened for sentencing in United States versus

4   Armani Eugene Gates.  This is Case Number 4:23-cr-103.

5          The Government is represented today by Assistant

6   United States Attorney Kristin Herrera.

7          Ms. Herrera, is the Government ready to proceed?

8          MS. HERRERA:  We are, Your Honor.

9          THE COURT:  Mr. Gates is present in the courtroom with

10  his attorney, Monty Brown.

11         Mr. Brown, is the defense ready to proceed?

12         MR. BROWN:  Yes, Your Honor, we are prepared to

13  proceed.  Thank you.

14         THE COURT:  Mr. Gates, you've been adjudicated guilty

15  of six offenses by virtue of your guilty plea.  Those offenses

16  include Count 1, conspiracy to distribute 400 grams or more of a

17  mixture or substance containing fentanyl; Count 2, unlawful user

18  in possession of a firearm; Counts 4 and 6, firearms trafficking

19  conspiracy; Count 7, straw purchasing conspiracy; and Count 29,

20  possession of a firearm in furtherance of a drug trafficking

21  crime.

22         The purpose of today's hearing is for me to determine

23  the sentence for those offenses.

24         Mr. Gates, do you understand what we're doing today,

25  sir?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Mr. Brown, have you and Mr. Gates had a

3   chance to read and discuss the presentence report and any

4   addendum thereto?

5          MR. BROWN:  Yes, Your Honor -- yes, Your Honor, in

6   person on multiple occasions.

7          THE COURT:  All right.  And I gathered from reading

8   your sentencing memorandum and some of the other materials that

9   you have some factual objections or clarifications to the PSR,

10   but it didn't appear to me that you had any legal objections to

11   the PSR or the calculation of the guidelines range.  Is that an

12   accurate statement?

13          MR. BROWN:  Yes, Your Honor.

14          THE COURT:  All right.  So, first off --

15          Well, let me turn to Ms. Herrera.

16          Ms. Herrera, does the Government have any factual or

17   legal objections to the PSR?

18          MS. HERRERA:  No, Your Honor.

19          THE COURT:  Okay.  So I'm going to adopt the

20   undisputed portions of the PSR in its entirety, and that

21   includes the total offense level calculation of 39, the criminal

22   history category of I, which yields a guidelines range of 262 to

23   327 months' imprisonment; plus there's a 60-month consecutive

24   mandatory penalty on the 924(c) charge, so, in effect, it's a

25   guidelines range of 322 to 387.

4

1          Mr. Brown, do you agree with that calculation of the

2    guidelines range?

3          MR. BROWN:  Yes, Your Honor.

4          THE COURT:  Ms. Herrera, do you as well?

5          MS. HERRERA:  I do, Your Honor.

6          THE COURT:  All right.  So let's talk about the

7    factual objections and clarifications, Mr. Brown.  And I'm going

8    to go through the list as I understand it, but if I miss any,

9    please let me know.

10         First, with respect to paragraph 12, my understanding

11   is that there's a dispute about whether Mr. Gates himself

12   discharged a weapon as opposed to being involved in the

13   discharge of a weapon by others.  Is that accurate?

14         MR. BROWN:  Yes, Your Honor.

15         THE COURT:  Ms. Herrera, does the Government have any

16   evidence that it wants to present on that or any position that

17   it wants to take on the clarification that the defense is asking

18   to be made?

19         MS. HERRERA:  Your Honor, we outlined this issue in

20   our sentencing memorandum regarding the wording in paragraph 12

21   and the implications therefrom.  We also do have a witness here

22   today who will testify globally both regarding the disputed

23   factual issues as well as the 3553(a) factors.

24         THE COURT:  Got it.  All right.

25         We'll hold off on the witness for just a minute

1  because I want to run through a handful of other statements.

2          So paragraph 13, Mr. Brown, is similar, so we'll just

3  kind of jump over that one.

4          Paragraph 16, there's an objection to an implication

5  that Mr. Gates might have been involved in a shooting in Ames,

6  but as I understand it, the Government isn't really asking for

7  me to draw that inference or implication; is that correct?

8          MS. HERRERA:  That's correct, Your Honor.  We have no

9  evidence that he was involved in the gang-related homicide in

10 Ames.  That information was simply included because it's one of

11 the hits from the NIBIN results from the defendant's gun.

12         THE COURT:  Got it.  So I'm going to, I guess, sustain

13 the defense objection to paragraph 16, but I'm not actually

14 going to make any changes to the PSR.  I'm just going to

15 recognize that the Government is not trying to suggest that

16 Mr. Gates was involved directly in the Ames shooting in the

17 sense of being present.

18         Then we've got paragraph 18 which, again, is an

19 objection to whether Mr. Gates shot a firearm or exchanged

20 gunfire personally.  I'll tie that in with paragraph 12 and 13.

21         There's an objection to paragraph 26 relating to

22 whether the minor that is referenced in paragraph 26 is

23 Mr. Gates' girlfriend who was then under the age of 18, but I

24 think the probation office made an adjustment.

25         So, Mr. Brown, is there any further clarification that

1   you're asking for in paragraph 18?

2          MR. BROWN:  No, Your Honor.

3          THE COURT:  I'm sorry.  Paragraph 26.  I jumped

4   over -- paragraph 26.

5          MR. BROWN:  No, Your Honor.

6          THE COURT:  Okay.  Then in paragraph 27, I think that

7   also got resolved.

8          Paragraph 66 was an objection to whether Mr. Gates was

9   the OMB leader.

10         And, Mr. Brown, is there any further record you want

11  to make on that in terms of the nature of the objection?

12         MR. BROWN:  Your Honor, we admit the sentencing

13  enhancement which can be established by other means and has been

14  in the presentence investigation.  We maintain -- we maintain

15  our objection to that.

16         To the extent that enhancement is predicated in part

17  upon that he was purportedly the leader of OMB, we maintain that

18  objection.

19         THE COURT:  All right.  Well, I'm going to overrule

20  that objection primarily because it's not going to be relevant

21  to my sentencing decision.  In fact, I don't even really need to

22  rule on it at all.  Whether he was literally the leader or just

23  had enough of a leadership position to warrant the aggravating

24  adjustment is beside the point.  The fact of the matter is it's

25  undisputed that there's enough evidence of leadership that he

1  gets the enhancement, and beyond that whether he was the

2  number 1 leader or just near the top or whether it had a

3  sufficient structure to have a single leader is really beside

4  the point, so that's my ruling on that one.

5          Then the last one on my list is paragraph 77 relating

6  to whether Mr. Gates used or directed others to use violence.

7          Is there any other record on that one you want to

8  make, Mr. Brown?

9          MR. BROWN:  Yeah.  We maintain the objection that the

10 record is absent of a specific either stochastic terrorism

11 behavior personally or an express order or directive to others

12 to use any violence that's set forth in the offense conduct

13 specifically.

14         THE COURT:  All right.

15         Ms. Herrera, any response?

16         MS. HERRERA:  No, Your Honor.  We had grouped this

17 into the category in our sentencing memorandum that I believe

18 the probation office resolved the objection to 77.  They -- as

19 well as paragraphs 13, 18, 26, 27, and 106.

20         THE COURT:  Got it.

21         Well, again, Mr. Brown, you're not challenging the

22 enhancement.  You just -- you just want to make sure that

23 Mr. Gates' role was, in your view, accurately represented; is

24 that fair?

25         MR. BROWN:  In the absence of other evidence by a

1    preponderance of the evidence that the Court finds credible that

2    he directed others specifically to use some violence either in

3    retaliation or otherwise.

4             THE COURT:  Okay.  But just so I'm clear, you're not

5    objecting to the plus 2 under section 2D1.1(b)(2) of the

6    guidelines; is that right?

7             MR. BROWN:  That's right.

8             THE COURT:  All right.  Well, then, again, to the

9    extent the objection wasn't fully resolved already, I'll

10   overrule it but only because we're in a situation where the

11   enhancement is correctly applied anyway, and it's just a

12   question of exactly how we phrase Mr. Gates' conduct and role.

13            Mr. Brown, are there any other factual objections that

14   you want to make sure I'm aware of?

15            MR. BROWN:  No, Your Honor.

16            THE COURT:  Okay.  With that, Ms. Herrera, you said

17   you had a witness and maybe some other evidence.  Why don't you

18   go ahead.

19            MS. HERRERA:  Yes.  Thank you, Your Honor.  And we

20   call Des Moines Police Detective Jeff George, and we also would

21   offer at this time Government Exhibits 1 through 9 which the

22   exhibit list and then the digital copies were provided.

23            THE COURT:  All right.  Sounds good.

24            So, Detective George, pause there for just a second.

25   The courtroom deputy is going to swear you in.

1    JEFFREY GEORGE, GOVERNMENT WITNESS, SWORN

2          THE COURT:  And, Mr. Brown, is there any objections to

3  Government Exhibits 1 through 9 coming in?

4          MR. BROWN:  No, Your Honor.

5          THE COURT:  All right.  Exhibits 1 through 9 are

6  admitted.

7      * * * Government Exhibits 1 through 9 admitted. * * *

8          THE COURT:  And, Ms. Herrera, whenever you're ready,

9  you can proceed.

10          MS. HERRERA:  Your Honor, would you like me at the

11  podium?

12          THE COURT:  You can be either place.

13          MS. HERRERA:  All right.  Thank you.

14                    DIRECT EXAMINATION

15  BY MS. HERRERA:

16  Q.  Could you please state and spell your name for the record,

17  sir.

18  A.  Yes.  It's Jeffrey George, J-e-f-f-r-e-y G-e-o-r-g-e.

19  Q.  What do you do for a living?

20  A.  I'm a detective for the Des Moines Police Department.

21  Q.  How long have you been a police officer?

22  A.  I've been a police officer for approximately 12 years now,

23  and I've been a detective for approximately 6 years now.

24  Q.  What unit are you currently assigned to?

25  A.  I'm in the intelligence section.

JEFFREY GEORGE - DIRECT

10

1  Q.  What does a detective in the intelligence section do?

2  A.  Primarily we investigate gun and gang crimes to include

3  robberies, homicides, shootings, illegal possession of firearms

4  within the city of Des Moines.

5  Q.  So are you familiar through your job duties with the gangs

6  that are operating in the city of Des Moines?

7  A.  Yes, ma'am.

8  Q.  What type of gang has typically operated within the city of

9  Des Moines?

10  A.  We call them local -- like neighborhood-based hybrid gangs,

11  so they're kind of a mixture of historical gangs within the city

12  of Des Moines, and then they also take on affiliations with

13  national gangs as well.

14  Q.  And could you describe what some of the characteristics of

15  are -- are of the neighborhood-based gang?

16  A.  Yeah.  So typically what we see in Des Moines, there's a

17  group of individuals who usually are smaller in numbers,

18  between -- anywhere between, like, 10 and 30 individuals.  A lot

19  of times they're younger people.  Between the ages of 12 and 22

20  is what our most active members are, and they're loosely

21  affiliated, but they evolve to the point where they're

22  committing a lot of crimes, so drug distribution, illegal

23  possession of firearms, shootings, robberies, homicides, things

24  of that nature.

25  Q.  What about the structure of these gangs?  How would you

JEFFREY GEORGE - DIRECT

11

1 describe that?

2 A.  Generally the structure is -- they're loosely structured.

3 There's not a clear at times, like, line of leadership, but

4 usually somebody takes a more prevalent role within those groups

5 in a sense of a leadership position or at least has a position

6 of influence over other members within the group.

7 Q.  And these neighborhood-based gangs that you witnessed

8 operating in Des Moines, do they use social media and rap videos

9 as any part of their gang activity?

10 A.  Yes, ma'am.  Social media is a key part to gang culture or

11 gangs, really generally in society but particularly with gangs

12 as well.  They'll use different platforms to promote their

13 gangs, show their activities, display their dominance, you know,

14 within the city, let other gangs know where they're at, let them

15 kind of know what they're up to, exploit others, show their

16 proceeds, you know, how wealthy -- how -- how well they're doing

17 off, you know -- on their illegal activities.

18 Q.  Have you heard of something called the OMB street gang?

19 A.  Yes, ma'am.

20 Q.  What does OMB stand for?

21 A.  Only My Brothers.

22 Q.  And is OMB one of those neighborhood gangs like you were

23 just describing?

24 A.  Yes, ma'am.

25 Q.  Is it part of a larger umbrella gang that's operating in

1  Des Moines?

2  A.  Yeah.  So the easiest way to kind of break it down is

3  that -- you can still trace it back to -- C-Block and Heavy

4  Hitters are kind of the two major factions of gangs in

5  Des Moines.  C-Block would be a Crip-affiliated group, and if

6  you kind of go through the lineage of the hybrid gangs, OMB

7  would fall under that, so they would be affiliated with C-Block,

8  and then nationally they'd be associated with the -- I'm

9  sorry -- Gangster Disciples.

10  Q.  Are you familiar with who OMB's rival gangs in Des Moines

11  would be?

12  A.  Yeah.  So kind of -- as I had stated, their rivals would

13  be -- fall under the umbrella of the Heavy Hitter side.  They

14  have a lot of hybrids that evolved over time, but the current

15  generation of that would be Strap Gang or OTR during the time

16  the OMB was active.

17  Q.  Can you generally discuss OMB's operations within the metro

18  area?

19  A.  Yes.  So they kind of evolved -- came on the scene in early

20  2022, late 2021 is when we started seeing members identifying as

21  OMB.  During that time, they were responsible for numerous

22  shootings within Des Moines, individuals being shot, residences

23  being shot.  They had a large fentanyl distribution ring

24  attributed to them.

25        They also were supplying firearms to their gang, so

JEFFREY GEORGE - DIRECT

13

1   there was a large firearm distribution ring as well affiliated

2   with the gang, and additionally they also had some sort of

3   source for switches -- automatic switches for their firearms, so

4   they were kind of known to have automatic handguns as well.

5   Q.   And you used the term switches.  What's a switch?

6   A.   It's a -- I believe the correct term would be a machine gun

7   conversion device.  It's basically a little attachment that can

8   go onto the end of a Glock model handgun which would make it

9   change from a semiautomatic handgun to a fully automatic

10  handgun, thus making it a machine gun under law.

11  Q.   And you mentioned that OMB -- OMB's members possessed some

12  of these switches?

13  A.   Yes.  They were frequently in possession of those switches.

14  They were displaying them on social media.  We've recovered

15  numerous switches from the group and its members, and, like I

16  said, they were kind of well known to have switches.  They

17  promoted their music videos as well.

18  Q.   And you mentioned that neighborhood gangs like OMB are

19  usually loosely structured.  They don't have any clear

20  leadership structure; correct?

21  A.   Yes, ma'am.

22  Q.   Given that, were you and the other investigators on this

23  case able to identify someone who seemed to be calling the shots

24  in this gang?

25  A.   Yes, ma'am.

JEFFREY GEORGE - DIRECT

14

1  Q.  And who was that?

2  A.  That was Armani Gates.

3  Q.  Why did you and the other investigators think that?

4  A.  So through the course of our investigation which lasted

5  roughly a year and a half, Mr. Gates kind of came to a position

6  of authority in the gang.  He seemed to have the source for

7  firearms.  He was implementing straw purchasers to supply the

8  group with firearms through Mr. Gates.  He also seemed to be the

9  main source for the fentanyl within the group and then would

10 thus distribute it out to other members through Mr. Gates.

11         When Mr. Gates became aware that there -- he was

12 probably being investigated, he began to use his position of

13 influence and authority over others within the gang to utilize

14 them to distribute the fentanyl in lieu of himself, so

15 throughout this investigation, Mr. Gates would -- had

16 historically sold fentanyl to CIs or undercover ATF agents, and

17 then he began to use his position of authority and influence to

18 use others to include females, other members of the gang to

19 distribute that fentanyl.  He used another member of the gang to

20 store the fentanyl at this other member's residence to distance

21 it from himself.

22 Q.  You just mentioned that the defendant became aware that he

23 was being investigated.  What do you mean by that?

24 A.  Yeah.  So we began to see some social media posts where he

25 literally would state that the feds were on him or investigating

1  him and stuff to the effect of "I've got to change my ways."

2  During that time, we did notice that Mr. Gates didn't cease from

3  his criminal activity but did kind of switch up his MO, per se,

4  and that's when he started using other gang members to sell the

5  fentanyl for him.

6  Q.  So even when he knew or suspected that he was under federal

7  investigation, he did not cease his criminal activity?

8  A.  Correct.  He continued it just through his influence over

9  others.

10  Q.  And those posts you mentioned, they're reflected in the

11  Government's Exhibit Number 8; correct?

12  A.  Yes, ma'am.

13  Q.  And -- and I'm sorry.  Government's Exhibit 9?

14  A.  Yes, ma'am.

15  Q.  We'll discuss this more in detail here in a couple minutes,

16  but does OMB utilize social media and rap videos in the manner

17  that you previously discussed regarding neighborhood gangs?

18  A.  Yes, ma'am.

19  Q.  You previously testified that law enforcement first observed

20  OMB become sort of active in the gang scene in Des Moines in

21  late 2021 and early 2022; correct?

22  A.  Yes, ma'am.

23  Q.  What happened after -- after that?

24  A.  So beginning in -- I think the first documented shooting

25  would have been in November -- late November of 2021, but

1   particularly beginning in February of 2022, the best way to

2   describe it is a large gang war erupted within the city of

3   Des Moines between OMB and the Strap Gang or OTR.  Over the

4   course of the next year, we attributed over 100 shootings to

5   these two groups.

6            There was multiple individuals shot.  There was

7   multiple gun seizures.  It was just a constant back and forth

8   throughout that time period, and murders resulted from this gang

9   dispute as well.

10  Q.  And what was the defendant's involvement in that?

11  A.  So, as stated, he was one of the core members of the OMB

12  gang.  He would frequently be at the scene of shootings.  His

13  vehicles would come up in the shootings.  He was -- I guess,

14  pled guilty or was convicted of a shooting in state court during

15  that time period.  There was gun recoveries from individuals in

16  and around him frequently throughout that time, and then there

17  was the large fentanyl distribution ring going on simultaneously

18  with the violence.

19  Q.  Of the 100 shootings that -- or over 100 shootings that

20  occurred during that one-and-a-half-year timeframe that you were

21  mentioning, did several of those occur at the defendant's former

22  residence here in Des Moines?

23  A.  Yes, ma'am.  He resided on Southwest Ninth Street here in

24  Des Moines, and throughout the spring of 2022, that was the

25  scene of multiple drive-by shootings.

1    Q.   Did the defendant cooperate with the police who arrived on

2    scene to try to investigate those shootings at his house?

3    A.   No, ma'am.   He would never speak or help further the

4    investigations.   One particular shooting -- drive-by at his

5    house he was not present, but while the police were on scene, he

6    had more or less tried sneaking into the house to avoid speaking

7    to police during that incident.   They would have made contact

8    with him, but he declined to really further that investigation

9    at all.

10   Q.   What happened instead of his cooperation with the police

11   after these shootings at his house?

12   A.   So we would see basically an MO or just a pattern with all

13   this, so there would be a shooting at Mr. Gates', and then

14   within the following days or a week, there would be a

15   retaliatory shooting against Strap Gang members with guns

16   attributed to the OMB side of the group, and this was a constant

17   back and forth throughout 2022.

18   Q.   At one point was defendant's residence moved to a suburb of

19   the city of Des Moines in order to try to curb the gang activity

20   that was occurring in the city of Des Moines?

21   A.   Yes.   His family did move to a western suburb.

22   Q.   And did that work, or did the defendant continue engaging in

23   gang activity?

24   A.   I believe that the opposition gang was not able to locate

25   his new address, so there was no shootings at that particular

1   location in the suburbs, but Mr. Gates did continue his criminal

2   activity.  The shootings continued within Des Moines, just at

3   various locations associated with OMB and Strap Gang members as

4   well.

5   Q.  During the one-and-a-half-year timeframe that we've been

6   discussing, were there also numerous social media posts and rap

7   videos being made by members of OMB?

8   A.  Yes, ma'am.

9   Q.  Are some of those represented in the Government's exhibits?

10  A.  Yes, ma'am.

11  Q.  And are those the totality of the rap videos or the social

12  media posts observed by law enforcement during this time period?

13  A.  No, ma'am.  There were hundreds, probably close to a

14  thousand, you know, different social media posts by different

15  OMB gang members and Strap Gang members as well.  Just as there

16  was violence on the streets, there was a constant back and forth

17  on social media between the two groups, and then, as stated,

18  there was a lot of rap videos being produced and distributed as

19  well during that time.

20  Q.  Can you explain to the Court how sort of the -- or what the

21  impact of these rap videos were on the gang violence that was

22  going on in our community?

23  A.  Yes.  So typically what would happen with OMB -- they had a

24  main rapper named Rashad Carr.  He would later be killed in the

25  Starts Right Here school shooting, but he was kind of the

JEFFREY GEORGE - DIRECT

19

1  prominent rapper for them.  Trent Brown was kind of

2  up-and-coming as well with Mr. Carr, but they were both

3  affiliated with OMB, so they would produce a lot of music videos

4  that were put out on YouTube and social media.

5       A lot of the lyrics of those videos were very

6  inflammatory and disrespectful towards the Strap Gang.  They

7  would display firearms in some of those videos, talk about

8  switches, talk about their current locations, where they would

9  hang out.  So in particular to OMB, they would claim ML King

10 Park here in Des Moines and Good Park, so a lot of the videos

11 reference hanging out at King's, which is a reference to King

12 Park which is a territory they would claim.

13      They would disrespect Strap Gang.  They'd say, When

14 we're spinning Six.  Strap Gang typically claims Sixth Avenue

15 here in Des Moines between University and Hickman, so when they

16 make references to Sixth Avenue, they're kind of challenging the

17 Strap Gang.

18      They would reference a lot of actual shootings that

19 had taken place here in Des Moines.  The most prevalent of those

20 music videos was the No Mentions music video which was made --

21 or at least dropped on January 16th of 2023.  In that video they

22 reference six different shootings or gang-related murders that

23 had taken place in Des Moines, and it was extremely inflammatory

24 and disrespectful to the Strap Gang because they were more or

25 less making fun of a lot of the Strap Gang members who had been

killed in actual shootings here in Des Moines. They claimed responsibility for some of those shootings.

There's a line in that video where they say, Kavi got shot and you didn't do shit to us. That was in reference to a shooting where Kaviarr Edwards, who is associated with the Strap Gang, got shot in the leg during a drive-by shooting where his house was shot over 70 times.

They also make reference to other Strap Gang members who have been killed to include Donzell Martin. He would have been a kind of generation before Strap Gang, but they're talking about smoking on dead gang members, things like that, so that entire music video was made to further inflame the gang tensions within Des Moines.

And then, in particular to that video, within -- that was on January 16th. On January 23rd of 2023, that music video was the main motivation for Rashad Carr and Gionni Dameron to be killed at school by a Strap Gang member in retaliation for that music video.

Q. And that would be the Starts Right Here double homicide?

A. Yes, ma'am.

Q. I want to follow up on a couple of things you mentioned just now. Why would OMB members in their social media posts want to let Strap Gang know their current location?

A. It's a challenge to them, more or less like you challenge somebody to a fight. You're saying, hey, we're going to be

1  here; if you want to have a conflict or whatever, this is where

2  we're going to be.

3  Q.   And when you said challenge or a conflict, does that usually

4  involve opposition gang members showing up at the scene and

5  there being some sort of violence?

6  A.   Yes, typically shootings.  As I had stated, OMB kind of

7  claimed -- or they did claim ML King Park here in Des Moines,

8  and that was the scene of multiple shootings that trace back to

9  OMB gang members and Strap Gang members as well.

10  Q.   And you also used the term smoking on dead gang members.

11  What -- what does that mean?

12  A.   It's a very inflammatory and disrespectful way to disrespect

13  a fallen opposing gang member.  So in the literal sense, they're

14  saying they're wrapping them up in, like, a blunt and smoking

15  them which is a disrespectful way to portray a fellow gang

16  member -- I'm sorry -- an opposing gang member.

17  Q.   So the rap videos that you discussed, you mentioned that

18  when they're talking about events in those videos, those are

19  actual events and acts and violence that occurred in the city of

20  Des Moines or the metro area?

21  A.   Yes, ma'am.  They talk about "Disrespect T-Y."  That was

22  Rashad Carr's uncle.  His name was Ty Hutchins.  He was

23  killed -- or murdered -- I believe it was December of '22.

24        They talk about Goo, who is Dontavius Sharkey.  I

25  believe the correct line is, Goo, you know what to do.  He was

1 found responsible for a baby shower shooting in which a Strap

2 Gang member was shot here in Des Moines.

3         They talk about Fat Ass.  He was -- He dropped his

4 gun.  That was in reference to Braden Shafer, who is a Strap

5 Gang member who got shot in the head during a gang-related

6 shooting, so that was a line making fun of him.

7         They talk about Lil Zo -- which is a reference --

8 there is two Zo's.  Alonzo Kearney was a Strap -- or a

9 Strap-side gang member who was killed in retaliation for another

10 gang-related murder of Karyee Henderson back in 2020, but he was

11 killed in November of 2022, and then it could also be in

12 reference to Jaquez Allen, who was affiliated with the

13 opposition side who was killed during a botched robbery.

14         They talk about the boy who died on Christmas.  That

15 was Travontay Jenkins, who was killed in an officer-involved

16 shooting on December 26, 2022.  Of note on that, Travontay

17 Jenkins was also found to be one of the individuals Mr. Gates

18 was shooting at during the shooting that he pled guilty to on

19 state court.

20 Q.  On that note, was the defendant personally involved in some

21 of the over 100 shootings that you mentioned?  You just talked

22 about one.  Were there others?

23 A.  Yes, ma'am.

24 Q.  And would you give the Court a few examples?

25 A.  The -- there was a shooting at Mr. Gates' residence in

1   November of 2021.  He was uncooperative in that case, but

2   through the investigation, we found out Mr. Gates was at his

3   residence with three other individuals who had fired at least

4   three separate handguns at a car that had been passing by his

5   house, so the shooting was on Mr. Gates' side.  He would have

6   been -- him and his associates would have been the ones shooting

7   in that case.

8           There was a shooting in, I believe it was, August of

9   2022 where Mr. Gates was shot.  There was multiple guns fired on

10  his side of that conflict and multiple guns fired on the other

11  side, so it was, once again, a shoot-out between the Strap Gang

12  and OMB.

13          There were shootings throughout the spring of 2022

14  where Mr. Gates' vehicles were associated with it to include his

15  car or his mother's car.  Casings from those would match up to

16  later shootings associated with OMB as well.

17  Q.  After the Starts Right Here double homicide that you

18  mentioned, did the defendant make a post on social media

19  taunting the opposition gang?

20  A.  Yes.  There was numerous posts talking about getting -- get

21  back or retaliation for that shooting, and that would continue

22  throughout the spring of 2023.

23  Q.  And one of those posts is reflected in Government Exhibit 8;

24  correct?

25  A.  Yes, ma'am.

24

1  Q.  Since the indictments in this case first came down in

2  July of 2023, have you noticed anything about the crime trends

3  in the city of Des Moines?

4  A.  Yes.  They have noticeably and measurably gone down.  We

5  have not had a gang-related murder in Des Moines since the

6  Starts Right Here murders.  There are still shootings that are

7  gang affiliated, but they've significantly reduced during that

8  course of time.

9          Another kind of measure of this was in 2022, the

10  Des Moines Police Department processed over 3,000 fired shell

11  casings throughout the city.  That's not to say all of them were

12  attributed to OMB and Strap Gang.  That's just the city as a

13  whole.  But, as I said, during that time, there was over 100

14  shootings that we could ballistically connect to these two

15  groups.

16          Throughout 2023, Des Moines Police Department

17  processed approximately 1,500 fired shell casings, so that's

18  almost a half reduction.  Once again, that's a totality of the

19  city.  We're talking about all shootings, but there was a

20  measurable decrease in gang-related shootings and violence since

21  that time.

22          MS. HERRERA:  I have nothing further at this time,

23  Your Honor.

24          THE COURT:  Mr. Brown, cross-examination?

25          MR. BROWN:  Yes, please.

JEFFREY GEORGE - CROSS

25

CROSS-EXAMINATION

1

2  BY MR. BROWN:

3  Q.  Good morning, Detective.

4          A couple things.  Let's discuss these two entities you

5  referred to as gangs.  You referred to one as OMB; is that

6  right?

7  A.  Yes, sir.

8  Q.  And then the competing gang, as it were, is -- the initials

9  are OTR; is that right?

10  A.  There's Strap and OTR.  OTR stands for Only the Real.

11  Historically they're kind of two separate hybrids, but they --

12  they link up, and more or less they're indecipherable between

13  the two now.

14  Q.  Of those three then, which came first, do you know?

15  A.  They've always been around.  Like I said, you kind of go

16  back through the lineage of how they've evolved.  The best way

17  to describe it would be that C-Block, Heavy Hitters divide, so I

18  think the Strap Gang was probably referred to as the Strap Gang

19  prior to OMB.  That was named after Elijah Brown-Townsend, who

20  was killed by one of his friends, but he had associated with the

21  Self-Made Gangsters or SMG gang, and then after he got killed,

22  they started calling themselves Strap Gang.

23  Q.  So you perceive OMB as what?  Some type of an offshoot or

24  organic -- organic creation of preexisting gangs that go back

25  what?  20, 30 years?

JEFFREY GEORGE - CROSS

1  A.  Yes, sir, and then like I said, they also have affiliations

2  with, like, the Gangster Disciples as well which would be a

3  national.

4  Q.  And then the social media posts themselves, particularly the

5  videos, you agree that this is classic or prototypical rap

6  music, do you not?

7  A.  It's -- it falls within that genre, and it's typical amongst

8  rap music, but with these particular songs like with OMB or

9  Strap Gang as well, they're talking about actual shootings that

10  have occurred a lot of times.

11  Q.  We'll get to the content, but in terms of the artistic form,

12  it -- the things that you're seeing OTR and OMB post, they --

13  they have the rhyme, they have the rhythm, they have the street

14  vernacular, and they have the beat; right?  That's all

15  consistent?

16  A.  Yeah.  I -- it would be rap music is how I would describe

17  it.

18  Q.  And in that rap music, there's lyrics that contain so-called

19  disses; right?

20  A.  Yes, sir.

21  Q.  And from time to time this rap music contains -- well, let

22  me ask this.  Do you know what drill rap is?

23  A.  Yes, sir.

24  Q.  Okay.  Is that what this -- you'd characterize some of these

25  social media posts by OMB as drill rap?

1   A.  Yes, sir.

2   Q.  All right.  And, now, let's talk just briefly about the No

3   Mentions video post that preceded the Starts Right Here

4   murder -- murders.  That was shot by Cash Gang Films; right?

5   A.  Off the top of my head, I don't recall.  I have no reason to

6   dispute that, though.

7   Q.  All right.  The defendant is present in that video; right?

8   A.  Yes, sir.

9   Q.  Can you attribute any single word that he says in that

10  video -- any single word that he says?

11  A.  No.  He -- and to, I guess, kind of get ahead of that maybe

12  line of questioning, I don't recall a video where Mr. Gates

13  actually rapped, but he was present in a lot of those videos.

14  Q.  There's no guns in that video; correct?  The No Mentions

15  video?

16  A.  Correct.  No firearms are displayed.

17  Q.  There's lyrics.  There's simulated blunt usage.  Somebody's

18  wearing an OMB sweatshirt; right?

19  A.  Yes, sir.

20  Q.  Somebody is carrying a shark backpack; right?

21  A.  Yes, sir.

22  Q.  Is there a true threat in that video that Mr. Gates appears

23  to adopt by being a performer in the video of something that's

24  going to happen in the future?

25  A.  I -- based on what we had known about the group up to that

JEFFREY GEORGE - CROSS

28

1  time and their activities, I would -- I would say that, yes.

2  Just based on kind of how it's progressed, there was -- it was

3  meant to inflame previous tensions and continue what was going

4  on.

5  Q.  Well, you certainly didn't testify in the Walls trial that

6  but for this video, Mr. Walls would not have entered the Starts

7  Right Here school carrying his gun with a 30-round magazine,

8  attempt to be ushered out by Mr. Keeps, and then return and kill

9  those two people.  You didn't say that; right?

10 A.  I don't recall particularly my verbiage, but through our

11 investigation, we found out that that video had a very prominent

12 role in what led up to that shooting.

13 Q.  But whatever role it had, Mr. -- Mr. Walls made the decision

14 to commit those crimes and attempted murder on Mr. Keeps; right?

15 A.  Yes, sir.

16 Q.  And other terms about this video, No Mentions, G2, there's

17 money being displayed; right?

18 A.  Yes, sir.

19 Q.  There's clothing wear being worn; right?

20 A.  Yes, sir.

21 Q.  Those are all classic First Amendment expressions of

22 hedonism and capitalism and materialism, are they not?

23 A.  There's nothing inherently illegal about displaying money or

24 wearing particular clothing, no, sir.

25 Q.  And then G3, the Kill Shot video, so named, that was

1  produced after the death of the two members, as it were, at the

2  school; right?

3  A.  Yes, sir.  The majority of that -- actually I think all of

4  that video was filmed at a celebration of life for Mr. Dameron

5  and Mr. Carr.

6  Q.  And there's no guns in that video, is there?

7  A.  No, sir.

8  Q.  There's money, there's twerking, blunting, but there's not

9  any real guns in that video?

10  A.  Not to my recollection, no, sir.

11  Q.  And then G4 -- have you watched G4?

12  A.  Yes.  If you could state the name --

13  Q.  The Opp Hunt music video?

14  A.  Yes, sir.

15  Q.  That video stars Trent Brown; right?

16  A.  Yes, sir.

17  Q.  Not -- the defendant is in it, but he's not the star of it;

18  right?

19  A.  Correct.  By that point in time, Mr. Carr -- he was

20  deceased, so Trent Brown kind of filled the void of Mr. Carr.

21  Q.  And there's money being displayed; right?

22  A.  Yes, sir.

23  Q.  There's fireworks?

24  A.  Yes, sir.

25  Q.  There's -- maybe it's a piano or something's on fire; right?

JEFFREY GEORGE - CROSS

30

1   A.   Yes, sir.

2   Q.   But there's no guns in that video?

3   A.   No firearms that I recall, no, sir.

4   Q.   Same with G5, Dumb Ways 2 Die.  That's a Honcho and Gio

5   memorial shot by Cash Gang Films; right?

6   A.   Yes, sir.

7   Q.   And there's money, dancing, blunting, but there's no guns in

8   that video, is there?

9   A.   No, sir.

10  Q.   Is there a true threat expressed by Trent Brown, the author

11  and the singer in that video?

12  A.   I don't recall any, like, direct threats.  Once again,

13  they're making fun of some opposing Strap Gang members who had

14  been killed is what the main context of that video was.

15  Q.   There's some language at the end about, You're going to die;

16  right?  I remember that.  Do you remember that?

17  A.   Yes, sir, I believe so.

18  Q.   Okay.  And is that just, like, some kind of dystopian

19  philosophy or apocalyptic ending, or what did you take that to

20  mean?

21  A.   Like I said, based on where everything was at at that point

22  in time, they're still responsible for shootings, committing

23  shootings against opposing gang members so -- I mean, it could

24  be taken as a threat.  Like, obviously a generalized threat

25  but --

JEFFREY GEORGE - CROSS

1    Q.   And G6, that's a Snapchat by the defendant.  There's several

2    hands -- hands displayed.  They're possessing firearms, some of

3    which have Glock switches.  You're familiar with that; right?

4    A.   Yes, sir.

5    Q.   Okay.  And then G7 is another video.  Are there any actual

6    firearms displayed in G7?

7    A.   And I apologize.  Is that the rap video or --

8    Q.   It's a video.

9    A.   The Snapchat video?

10   Q.   Yeah.

11            MS. HERRERA:  Your Honor, I can provide him with the

12   Government's exhibit list, if that --

13            MR. BROWN:  What --

14            MS. HERRERA:  Do you want to give him the exhibit list

15   that has the video titles on it?  I have it.

16            MR. BROWN:  I have it.  May I approach, Your Honor?

17            THE COURT:  You may.

18   A.   I apologize.  I'm more familiar with the names as opposed to

19   the exhibit numbers.

20   Q.   I'm referring to G7.  How is that labeled by the Government?

21   A.   Yeah.  So that's KRM Ai TMB OMB Music Video.

22   Q.   And in that video, there's a tequila bottle displayed and a

23   bunch of money being rolled up sleeves; right?

24   A.   Yes, sir.

25   Q.   Cell phones being waved?

JEFFREY GEORGE - CROSS

1  A.   Yes, sir.

2  Q.   Blunting; right?

3  A.   Yes, sir.

4  Q.   Trent Brown points a finger, and there's a discharge noise;

5  right?

6  A.   Yes, sir.

7  Q.   There's no actual guns in that video; is that right?

8  A.   That's incorrect, sir.   There was a firearm in the waistband

9  of Awot Baliho in the background of that video.   We would do a

10  traffic stop that afternoon when that video was shot and recover

11  that firearm from Mr. Baliho that he was subsequently charged

12  with.

13  Q.   And then GX8, that's a Snapchat that the defendant posted;

14  is that right?

15  A.   Yes, sir.

16  Q.   And in part it says, quote, We aim to get back.  Do you

17  remember that?

18  A.   Yes, sir.

19  Q.   Okay.  And you're interpreting that as that the defendant

20  was expressing some intention to retaliate; is that right?

21  A.   Yes, sir.  He's also talking about the -- in summary, the

22  opps are scared to come out, something about get back, so he's

23  making reference to opps, opposition gang members, not making

24  themselves available to get retaliation more or less.

25  Q.   Did you -- and there's a picture of the street overlaid

1   under that -- by those words; right?

2   A.  Yes, sir.

3   Q.  Is the street not in Denver, Colorado?

4   A.  I'm not sure where the street was.

5   Q.  And one more here.  GX9, that's another Snapchat post that

6   the defendant made; right?

7   A.  Yes, sir.

8   Q.  And this is the post where he's referring to that he heard

9   the feds were on his trail and he had to change his routes;

10  right?

11  A.  Yes, sir.

12  Q.  And he's been ducking indictments; is that right?

13  A.  Yes, sir.

14  Q.  Isn't -- isn't -- isn't that language from two popular rap

15  songs called Indictment Season by LA4 and Indicted by Big Don

16  Bino?  Isn't that what that language is from?  He's just quoting

17  rap guys?

18  A.  I'm not familiar with those particular rappers or lyrics

19  from them.  Like I said, at that time, Mr. Gates --

20  Q.  But if he means that -- he knows that the feds are on his

21  trail but continues to engage at least in the fentanyl

22  distribution conduct -- doesn't that reflect some kind of

23  fatalism or immaturity and failure to appreciate the

24  consequences of his actions?  I mean, it's stupid; right?

25  A.  It's not smart, but I would disagree because he did change

JEFFREY GEORGE - CROSS

34

1  up his MO at that time, so instead of himself personally

2  delivering the narcotics, he began to have others deliver it for

3  him, so he began to try to distance himself from that

4  distribution during that time which I believe was a safeguard.

5  Q.  But how are you -- how are you distancing yourself if you

6  know the feds are on your trail and you're ducking an indictment

7  and you're publicly broadcasting under OMB74 on Snapchat that

8  the feds are on your trail?  I mean, they're watching the

9  Snapchat; right?  Does that make any sense?

10 A.  Not particularly, but I'm not necessarily an expert either.

11        MR. BROWN:  One more thing, and I'm done, Your Honor.

12 Q.  On multiple occasions the defendant's house where his mother

13 rented on the south side of Des Moines got shot up; right?

14 A.  Yes, sir.

15 Q.  And her Dodge Charger got shot up; correct?

16 A.  Yes, sir.

17 Q.  His sister's car got shot up?

18 A.  Yes, sir.

19 Q.  And on at least one of those occasions during a drive-by at

20 his mother's house on Southwest 9th, there were shell casings

21 found that the police attributed to the defendant and his

22 friends firing back at the drive-by car; right?

23 A.  I believe you're referencing the November '21 shooting.  So

24 in that case the casings were only on Mr. Gates' property, so

25 the evidence showed that only Mr. Gates' side had fired at a

JEFFREY GEORGE - CROSS

1    vehicle in that particular incident.

2    Q.  As they passed by apparently?

3    A.  Yes, sir.

4    Q.  All right.  But you don't have any direct evidence that --

5    it's an inference, but you don't have any direct evidence that

6    Mr. Gates fired any of those bullets, do you?

7    A.  The -- as I stated, there was four individuals to include

8    Mr. Gates.  Ballistically, there was three different firearms

9    fired, so inherently three of the four had fired.

10   Q.  And with respect to this -- his own victimization and the

11   victimization of his mother's car and his mother's house and his

12   sister's car, wouldn't you agree that to the extent that he

13   joined a gang to gain respect and to feel safer and perceive

14   that he was protected from his rivals that just the opposite

15   happened?

16   A.  I don't know his motivations for joining a gang.

17   Q.  Well, aren't you a gang expert?  Don't you understand the

18   socioeconomic drivers, the push-pulls that have been studied by

19   Ph.D.s and social scientists as to why people join gangs?

20   A.  I'm aware of the various factors, yes, sir.  Particularly

21   with Mr. Gates, I don't know, once again, within his head why he

22   joined a gang.

23   Q.  Fair enough.  But do you agree that he evidenced behavior

24   that failed to appreciate the risks and consequences of his gang

25   involvement that included escalation against his own family that

JEFFREY GEORGE - CROSS

1  he couldn't control?

2  A.  I would dispute the fact that he couldn't control it.  I

3  mean, he -- he continued within that lifestyle with his actions

4  and continued, you know, being involved in shootings, you know,

5  even with his residence being shot up.  Like I said, there was a

6  lot of retaliatory shootings for that, lack of cooperation with

7  the police department, you know, to truly solve those crimes.

8  Like I said, it just continued to escalate from that point.

9  Q.  Well, lack of cooperation at least from the Des Moines

10  Police Department's perspective is epidemic in the black

11  community, is it not?

12  A.  Not always.

13  Q.  Do you agree that these young men who participate in these

14  rap videos, whether they're called dis videos or drill videos,

15  it's part of a larger strategy to appear more violent and

16  ruthless and menacing than they actually are?  Do you agree with

17  that?

18  A.  No.  I do believe it's -- and to show, you know, their

19  authority, their violence and nature, but like I said, it's

20  backed up by actual shootings that have taken place, so it's not

21  necessarily portrayal.  I would say it's factual that they are

22  violent and inherently dangerous.

23          MR. BROWN:  No further questions, Your Honor.  Thank

24  you.

25          THE COURT:  Ms. Herrera, redirect?

1          MS. HERRERA:  Just briefly, Your Honor.

2                   REDIRECT EXAMINATION

3    BY MS. HERRERA:

4    Q.   Detective George, Mr. Brown asked you about the Government

5    Exhibit 7 music video, the KRM Ai TMB OMB, and you mentioned

6    on -- that there was a gun displayed in that music video that

7    was recovered that same date by law enforcement; correct?

8    A.   Yes, ma'am.

9    Q.   And you said that it was recovered from Awot Baliho;

10   correct?

11   A.   Yes, ma'am.

12   Q.   And Awot Baliho was a convicted felon and actually on the

13   sex offender registry at the time that gun was recovered;

14   correct?

15   A.   Yes, ma'am.

16   Q.   And that gun in particular and the recovery -- you wouldn't

17   know this, but this is mentioned in the presentence report as

18   one of the guns that the defendant straw purchased and

19   trafficked; correct?

20   A.   Yes, ma'am.  It was part of the straw purchase conspiracy.

21   Q.   And it actually matched back ballistically to a firearm used

22   in the August 2022 gang-related shooting that you testified

23   about on direct examination where the defendant was shot in the

24   leg; correct?

25   A.   Yes, ma'am, and it would have been on the OMB side of that

1  shoot-out.

2          MS. HERRERA:  Nothing further, Your Honor.

3          THE COURT:  Mr. Brown, any follow-up to that?

4          MR. BROWN:  No, thank you.

5          THE COURT:  All right.  Detective George, you're

6  excused.

7          Ms. Herrera, does the Government have any more

8  evidence it wishes to present?

9          MS. HERRERA:  No.  Thank you, Your Honor.

10          THE COURT:  Mr. Brown, does the defense have any

11  evidence that it wishes to present?

12          MR. BROWN:  Your Honor, we submitted letters of

13  support -- letters of support and videos of support that I

14  believe I have previously marked and submitted and filed online.

15  We offer those sentencing exhibits at this time.

16          THE COURT:  All right.  All of those will be admitted.

17     * * * Defense Exhibits G1, G2, and G3 admitted. * * *

18          THE COURT:  I've already read the letters and reviewed

19  the videos.  I found those very helpful, as I always do, so

20  those will be part of the record.

21          Is there anything else, Mr. Brown, you think we need

22  to take up before I give each side an opportunity to be heard on

23  the appropriate sentence?

24          MR. BROWN:  No, Your Honor.

25          THE COURT:  How about you, Ms. Herrera?  Is there

1  anything we need to take up?

2         MS. HERRERA:  No, Your Honor.

3         THE COURT:  In that case then, Mr. Brown, let me hear

4  from you first on Mr. Gates' behalf as to the sentence you

5  believe is appropriate.

6         MR. BROWN:  Thank you, Your Honor.

7         Your Honor, it's been my pleasure to represent as a

8  CJA counsel in this matter.  I would say that the investigation

9  in this matter was professionally accomplished and as it was

10 prosecuted as well and it's in the public's interest.  The

11 question here, of course, is what's the individual sentence that

12 is to be beget from this investigation and these pleas that this

13 20-year-old has entered.

14        You know, on this record I've identified -- we've

15 admitted but also identified what we think are mitigating

16 factors.  It seems to me that the question that the Government

17 poses is that, you know, basically Mr. Gates is this obnoxious,

18 invasive, dangerous person, and the only way that we could

19 protect society is to pull him up from his roots and replant him

20 in a USP until he's 45, 50 years old.

21        I just simply disagree.  I don't believe that the

22 statistical predictors and predicators that the Government

23 relies upon fully evaluate the underlying racial and

24 socioeconomic problems that drive young men even as early as 17

25 in this case, possibly earlier, to become involved in this

1  complex behavior, dangerous as it is.

2          I don't believe these -- the statistics that the

3  Government cites necessarily suggests that a longer is better --

4  a longer sentence than shorter one is necessarily safer and of

5  public interest to the community and justice at large.  It

6  certainly doesn't rehabilitate Mr. Gates.  It certainly appears

7  to be more retaliatory, at best.

8          Mr. Gates is a young man in need of a variety of

9  assistance.  He needs help from us.  He needs vocational help.

10 He needs drug treatment.  He needs educational help.  He's not

11 stupid.  You know, his GPA at school -- you can get a .267 for

12 writing your name down at the top of the page.  He just wasn't

13 trying.

14         So to the extent that, you know, he had some control

15 and leadership of the drug conspiracy and the firearms

16 trafficking which he admits, that shows he has intuitive

17 intelligence.  Now he needs help with becoming a man and help

18 figuring out ways not to engage in this high-risk behavior that

19 has been identified in the record, that's been admitted in his

20 plea and admitted in the presentence investigation, that if he

21 understands the risk and consequences, he's either a fool, or he

22 wants the ultimate outcome, and that's just to be killed on the

23 street, in a car or in a yard someplace and bleed to death, and

24 nobody's going to tell anybody anything about who did it, and if

25 that's the outcome he wants, you know, that's the outcome I

1  think he's going to age out of.

2          And you're going to hear from him.  I don't see -- and

3  we advocate -- that an extremely long prison sentence in order

4  to age him out of criminal thinking is a just result in this

5  particular case.

6          As you know, Bishop Reed points out, you know, in his

7  letter to the Court basically in anticipatory response to the

8  Government's statistical predictors, there are systemic

9  statistical disparities that men like Armani are subjected to.

10  That's a fact as well.

11          If he started out as young as they say he does, then

12  he has the capacity to change, if that's his self-motivation and

13  determination, Your Honor.  That's the whole concept behind

14  *Miller* itself and the concept of treating 18- to 20-year-olds

15  under certain law disparities different from adults because they

16  don't appreciate the risk, they don't understand the

17  consequences fully, and they have the ability to change as they

18  get older.

19          I want to comment just briefly on a couple things that

20  are in the Government's well-done sentencing memo which I

21  respectfully disagree with in some respects.

22          With regard to the fentanyl distribution, that's

23  totally symptomatic of this global immaturity and failure to

24  appreciate the risks and consequences of his behavior.  It's

25  evidence of the lure of easy money, this hedonism and

materiality.

He's not the genesis of this whole fentanyl invasion with the global cartels, the foreign sales, the ingredients, the pill-picking machines. He didn't create all that. He's just another niche capitalist at 18 or 20 years old that's selling these pills in the wake of the nation's opioid scandal.

The firearms distribution -- clearly it's an aggravating factor, but the Government suggests this is totally his fault. Well, is it? We have straw purchasers, Eason and his girlfriend. We have the related-case straw purchasers.

We have Congress's refusal to regulate private sales, even requiring a Form 4473 or to allow ATF even to track these private-sale firearms, and that just adds to the proliferation, and these loopholes are then exploited by people who don't appreciate the risks and the consequences like Armani Gates and others, and to suggest that it's all his fault, that's just not exactly true.

We haven't denied in the presentence investigation that the OMB is real. It is. Is it a RICO organization? Well, he didn't have to plead to that, but we don't deny that he had controlling aspects of the relevant facts in this case. He wasn't some street urchin, however, and corner combatant.

He lived in the suburbs. He lived on the south side of Des Moines. This -- there's mobility now, and that causes transitory violence in location which from one perspective, I

1  guess, that makes it more dangerous to the rest of us, but to

2  label this as just, you know, a criminal street gang, I mean,

3  when the methamphetamine scourge and the pills and the anhydrous

4  were around, we didn't call them criminal farm gangs.  That's

5  because they were white guys.  You know, we don't call it the

6  criminal White House insurrection gang.

7         So that doesn't really help us out, to call them just

8  a criminal street gang member.  It is what it is, and largely

9  it's aggravating.  I admit that.

10        The music largely -- with the exception of the

11  historical references to events in the past is largely First

12  Amendment protected materials, and whether we like it or not or

13  understand it, it's part of the First Amendment expression.  You

14  know, he doesn't really say anything in any of them that we can

15  really articulate.  He doesn't refer to a future blood bath.  He

16  doesn't personally threaten anybody.

17        He clearly is responsible as a member of OMB for Trent

18  Brown's lyrics to the extent that he participated in them.

19  Yeah.  That's extremely unfortunate that children were involved

20  in the video after the funeral, and if you ask him, he's going

21  to tell you that was a serious mistake.  On the other hand, you

22  have white politicians who, you know, have Christmas cards with

23  their children holding AR15s.  You know, mistakes are made on

24  social media.

25        The distinguishing between whether this social media

1    is a true threat and passes the *Brandenburg* test, that's a

2    tricky issue.

3           He admitted the 924(c) violation.  There's no evidence

4    that gun was linked to any specific shooting events.  That gun,

5    no.

6           In sum, for the reasons I articulated in my memo --

7    you know, he's got a long-term substance abuse, both oxy and

8    marijuana, and in this particular context, his marijuana usage

9    is not benign, and he has a substantial need for vocational or

10   educational training.  He does have strong support in his

11   family.  They love him.  He has a new son on the way.

12          In paragraph 97, he renounces the gang and the

13   violence, and that's -- the Government hasn't objected to that

14   paragraph.  It, therefore, becomes true.

15          There's a suggestion of untreated ADHD in his past,

16   possible dyslexia.  He does have some work history.

17          Apparently he didn't get in any fights in the jail.

18   He wasn't a significant jail discipline.  They don't have any

19   jail calls saying he fails to take responsibility, talking to

20   gang -- Al Capone on the phone.  No evidence he's obstructed.

21          He's -- he's super accepting with those minor details

22   that -- I think, you know, facts matter -- that I objected to in

23   the presentence investigation.  He's the only one that's taken

24   responsibility so far, best I can tell, in the global OMB

25   indictments and related case.

1          I just don't see him as a hopeless human.  You know,

2    what will his intentions be at age 33, 35, or 37?  That's the

3    question.  I don't think we have to wait until age 45 or 50 to

4    find out.  I'm not going to be here anyway.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Brown.

7          Mr. Gates, at this time I do want to give you that

8    opportunity to speak to tell me anything you'd like me to know

9    as I make my sentencing decision.  Mr. Brown suggested you do

10   have something to tell me, and I'm glad to hear it.  I do want

11   to make sure you know you don't have to speak today if you don't

12   want to, but if you'd like to, I'd be glad to listen.

13         THE DEFENDANT:  Yes, sir.

14         I just want to first say that I apologize to the

15   community of Des Moines, to anybody that feels like I've hurt

16   them.

17         I want to apologize also to my mother for all the

18   stress that I've put on her, for all the nights I know that she

19   couldn't sleep when -- if I'm okay or not.  I want to apologize

20   to my siblings.

21         I don't want anybody to think that I'm a bad person.

22   I don't want when people hear my name -- I don't want people to

23   think or find that I'm some angry person.  I want to be a better

24   person not only for myself but for my family.

25         And I have a son that's about to be brought into this

1  world.  I don't want him to grow up without a father like I had

2  to.  I have nephews that I know that look up to me.  I want them

3  to know that their uncle's a great person.  I want them to be

4  able to depend on me.  I want my sisters to be able to depend on

5  me as much as I've been depending on them.

6        I want to take this time that I'm given -- I want to

7  use this to rebuild myself, to -- I want to join as many

8  programs as I can.  I want to get into treatment.  I want -- I

9  want to be better.

10        I want to rebuild my community.  I don't want any -- I

11  don't want -- I want to start programs to help young black kids

12  to know that they don't have to carry guns or they don't have to

13  sell drugs to be cool, that there's a lot of different routes.

14        I just want to apologize to everyone.  I'm sorry.  I

15  wish I could take it back.  I know that I was doing a lot of

16  wrong, but the only thing I can do is just rebuild myself for

17  the future.

18        I don't want my son to grow up like I did.  I don't

19  want my son to follow my steps.  I don't want him to go -- have

20  to go through any of this.  I don't want any of my nephews that

21  I know love me -- I don't want any of them to go through any of

22  this.  I don't -- I don't never want to go through this again.

23        I just want to say I'm sorry, man.  I wish I -- I wish

24  I could go back, but I can't.  The only thing I can do is just

25  make the future -- just build myself.  I just want to apologize

1  to everyone, man.  I'm sorry.

2          THE COURT:  All right.  Thank you, Mr. Gates.

3          Ms. Herrera, at this time let me hear from you on

4  behalf of the Government as to the sentence you believe is

5  appropriate.

6          MS. HERRERA:  Thank you, Your Honor.

7          Much of the focus of this hearing and the defendant's

8  filings and his argument here today has been all about the

9  defendant's gang activity and rightfully so.  It's a problem

10 that's plaguing our communities, poisoning our youth, and

11 causing immeasurable damage on the streets and in people's

12 homes, but this is damage that defendant's behavior was designed

13 to not only maximize but prolong for as long as possible.

14         However, even setting all that aside, the Court should

15 not lose sight of the crimes -- the facts underlying the crimes

16 that defendant pled guilty to and the seriousness of those

17 crimes of conviction, even setting aside the gang activity.

18         He was involved and had a leadership role in a drug

19 conspiracy responsible for the distribution of over 3.5

20 kilograms of fentanyl into our community, and as this Court is

21 very much aware and Mr. Brown alluded to in his argument just a

22 few moments ago, fentanyl is an incredibly dangerous drug.  It's

23 responsible for numerous overdoses in our community, deaths from

24 those overdoses, and furthering people's addictions to this

25 substance.

1           And we also have the traffic -- firearms trafficking

2    and straw purchasing activity that the defendant was involved in

3    which is well outlined in the PSR as well as the Government's

4    sentencing memorandum.  The defendant was illegally straw

5    purchasing guns, using people he was selling drugs to to buy him

6    guns, and then funneling those guns to people who shouldn't have

7    them:  drug users, felons, and his fellow gang members, and this

8    wasn't one, two, or even three guns, but it was a large number

9    of firearms, as outlined in the PSR, and those guns were used in

10   crimes including at least two shootings that we know of.  They

11   were converted to machine guns, and they were outfitted with

12   high-capacity magazines including a drum magazine in the firearm

13   that was talked about here today in the testimony.

14           All of this even without the gang activity is

15   incredibly serious conduct that would warrant a significant

16   sentence in this case, but overarching all of this and in some

17   ways intertwined with all of this is the gang activity that

18   we've discussed a lot leading up to this hearing and during this

19   hearing.

20           Defendant wasn't a passive member of OMB looking for a

21   place to belong.  He had one.  He had a loving home.  By all

22   indications -- Mr. Brown submitted a lot of family support

23   letters and videos -- he had somewhere to belong.  He had a

24   supportive family, and they by all accounts provided him with

25   the support he needed, but even in the face of that support,

1    defendant chose the path he did which was to associate and be a

2    member of this criminal street gang.

3          But that's kind of the theme here that we see

4    throughout defendant's life is that no matter what intervention

5    he's offered -- he's been offered jobs; he's had jobs; he's had

6    family support; he's been offered substance abuse treatment;

7    he's been on state probation and was on state probation for a

8    lot of the conduct in this federal case -- he has declined or

9    refused to take advantage of any of those opportunities that

10   have been presented to him to choose another path, and the

11   Government argues that this shows what defendant's core values

12   really are, and that is drug trafficking, gang activity, and

13   firearms activity, and defendant's choices that he's made

14   throughout the large majority of his life have consequences, and

15   the time has finally come for him to face them in this court.

16         This Court should sentence him to 322 months in prison

17   as advocated for in our sentencing memorandum because that's 322

18   months that his neighbors can go to bed without having to worry

19   about a bullet ripping through their bedroom or their living

20   room wall; that's 322 months that a child walking home from

21   school doesn't have to worry about a stray bullet from one of

22   defendant's guns hitting them and causing them to be injured or,

23   even worse, to be killed; and that's 322 months the defendant

24   won't be able to pedal dangerous drugs into our community.

25         The Court should impose a significant sentence, and it

1    should impose 322 months.  Thank you.

2             THE COURT:  Thank you, Ms. Herrera.

3             Mr. Gates, when I sentence somebody, there are a list

4    of factors that I have to consider.  They're set out in a

5    federal statute.  It's Title 18, United States Code section

6    3553(a).  My responsibility, what Congress tells me I have to

7    do, is determine the sentence that is sufficient but not greater

8    than necessary to comply with the purposes that are set forth in

9    that statute.

10            I've thought about all of the factors that are listed

11   in that statute.  I may not talk about all of them, but I will

12   talk about some of them.

13            Let me start, though, by saying this.  This is such a

14   complicated case on so many different levels.

15            Mr. Brown, you and I have known each other for a long

16   time, and I thought your argument was one of the most

17   interesting and compelling that I've seen because there's so

18   much racial complexity and socioeconomic complexity and even

19   artistic complexity.  How do we look at this stuff?  Do we want

20   to be paranoid and be scared by all of it?  Or do we want to

21   look at it in context and understand the complicated dynamics

22   that go into a rap video or a gang dispute or the fact that

23   somebody joins a gang in the first place?  There's so much

24   complexity in those questions.

25            Ultimately I can't come up with the right answer for

1  addressing all of that complexity; all I can do is analyze the

2  section 3553(a) factors to the specific circumstances here, but

3  I recognize the complexity, and on some level it certainly does

4  go into my analysis of the situation.

5          In terms of the actual factors that are listed in the

6  statute, the first and usually most important is the nature and

7  circumstances of the offense, and here both sides have correctly

8  recognized that the offenses are unquestionably serious, and in

9  a lot of ways even though they're all charged together in a

10  single indictment, there's almost two different things going on

11  here.

12          On the one hand, there are the gun offenses and the

13  straw purchasing conspiracy and the relevance that that

14  conspiracy has had to some of the gang-related disputes and

15  shootings that we've had in the Des Moines area over the last

16  several years, and then separately is this fentanyl distribution

17  conspiracy.  And, again, I understand they're interrelated.

18  They were properly brought together, but I see them as almost

19  two different situations that have converged with this

20  particular defendant.  They're both really serious.

21          Fentanyl is a dangerous drug.  We've seen a spike in

22  fentanyl overdose deaths.  Part of the problem with fentanyl is

23  that sometimes the composition of the fentanyl isn't what people

24  expect and it's more dangerous than they think, and so even if

25  this was just about fentanyl, it would be really serious.  Now,

1   the penalties reflect that.  There's a 10-year mandatory

2   minimum.  The guidelines go even above 10, but in any event,

3   that piece of it is certainly serious.

4           And, of course, the gun aspects of the offense are

5   very serious too.

6           I recognize that there's a little bit of a dispute

7   about exactly the nature of the leadership role that Mr. Gates

8   had in the OMB gang, but certainly he had some leadership role.

9   That's why the enhancement applied.  That's reflected in the

10  offense conduct.

11          There were a number of different guns that were

12  involved including a confidential informant buying guns for him.

13  Some of those ended up being involved or being connected in

14  gang-related shootings, so there's a direct line between

15  Mr. Gates' conduct and some of the most serious acts of violence

16  that we've had in the community, so, again, all of that is

17  really serious.  And, Mr. Brown and Mr. Gates, you accepted that

18  and understood that, so I appreciate your recognition of the

19  seriousness of the offense, and so that's why no matter what I

20  do, it's going to be a long sentence.

21          Another factor that I have to consider is Mr. Gates'

22  history and characteristics, and that's complicated too.

23          On the one hand, he has basically no criminal history

24  other than the one prior conviction for intimidation with a

25  dangerous weapon which doesn't even count for any criminal

1  history points because it's wrapped into the offense conduct for

2  this particular offense, so it's basically part of this same

3  offense.  It's really not that common for me to have a

4  20-year-old here with no criminal history beyond just that one

5  thing.  Usually if a 20-year-old ends up in federal court,

6  they've got more criminal history than that.

7          What that tells me, Mr. Gates, is that you do have the

8  ability not to be involved in violence and drug-related activity

9  because you've shown that.

10          And speaking of age, that is absolutely a factor here.

11  The Government's right, that age does not mean the likelihood of

12  recidivism goes down per se, but, Mr. Brown and Mr. Gates, I

13  understand you to be focusing on age in a slightly different way

14  which is we recognize, the science recognizes that people who

15  are 18, 19, 20 years old make more immature decisions than

16  people who are 25, 30, 35, 40, and there's no question but that

17  age and immaturity were a big part of the conduct here.

18          It's like you pointed out, Mr. Brown, with the

19  witness.  I mean, okay, so Mr. Gates knows he's under federal

20  investigation and then immediately starts broadcasting the fact

21  that he's going to try and sneak around on social media accounts

22  that can be viewed by dozens, if not hundreds, of people.  That

23  is obvious age-related immaturity as opposed to some indication

24  that Mr. Gates is forever going to be living a criminal

25  lifestyle.

1          So his history and characteristics are complicated.

2     On the other hand, though, the history is what it is.   In terms

3     of two or three years of involvement in criminal activity, that

4     is real serious:   the drugs, the guns, the gang rivalries and

5     disputes, the escalation of all of them.   All of that is really

6     serious.

7          And that feeds into some of the other factors I have

8     to consider:   reflecting the seriousness of the offense,

9     promoting respect for the law, providing just punishment,

10    protecting the public from further crimes, affording adequate

11    deterrence.   All of those are really, really important because

12    although people who are 18, 19, 20 years old are always going to

13    have trouble making decisions that are as mature and carefully

14    thought out as the decisions that a 30- or 35- or 40-year-old

15    would make, I do think even the average 18- or 19- or

16    20-year-old understands that a long prison sentence is something

17    you don't want, and so in that sense, the sentence that I impose

18    today can -- can send a signal, a message.

19         One last thing on Mr. Gates' history and

20    characteristics that I want to make sure to point out, you've

21    obviously got so much family and community support.   I see it in

22    the courtroom today.   I saw it in the letters that were

23    submitted on your behalf.   That is something that you should be

24    proud of, and that tells me something about you.   Whatever

25    sentence I impose, you've got the support network around you to

1   help you be better in the future.  I'm just sorry that it didn't

2   work to keep you out of this in the first place, but I did

3   appreciate all those letters of support, and I appreciate people

4   being here today.

5          I do have to consider the sentencing guidelines

6   themselves.  I don't have to follow the guidelines, but I do

7   have to take them seriously.  Ultimately I have to make an

8   individualized assessment, though, of the right sentence based

9   on the facts and based on my analysis of the section 3553(a)

10  factors.

11         Here I think the guidelines range is a little too high

12  primarily because of Mr. Gates' age.  Most of the offense

13  conduct here -- maybe all of the offense conduct here happened

14  when he was 18 or 19 years old, and although it's incredibly

15  serious, the shootings and things like that, the fact that he

16  was 18 or 19 when it happened is unquestionably mitigating.  The

17  only question is how much.

18         I don't have a perfect answer, but after considering

19  all of the 3553(a) factors, the sentence that I've decided is

20  appropriate is going to be, in total, a 276-month sentence.

21  That's 23 years.  That's 216 months on the underlying drug

22  charges and then 60 months on the 924(c) charge, the possession

23  of a gun in furtherance charge, so that's in total 276 months of

24  imprisonment that I conclude is sufficient but not greater than

25  necessary to satisfy the 3553(a)(2) factors.

1         And let me add a little bit more clarity.  So on

2    Count 1, it will be 216 months; Count 2, it will be 120 months,

3    which is the statutory maximum; Counts 4 and 6, it will be 180

4    months, that's the statutory maximum; Count 7, it will be 216

5    months; and then Count 29 will be the additional 60 months, and

6    so all of Counts 1, 2, 4, 6, and 7 will run concurrently with

7    each other; Count 29, by statute, will run consecutive to all

8    the others.

9         The point, though, is it's a 23-year sentence.  That's

10   a long sentence, Mr. Gates.  I understand that, but it is the

11   sentence that I conclude is appropriate here.  You're going to

12   come out of it with a lot of years left to live.  You're going

13   to have an opportunity for programming in the Bureau of Prisons.

14   I hope you take advantage of all of it.

15        When you get done serving your prison sentence, you're

16   going to be on supervised release for 5 years.  There are a

17   number of conditions of supervised release.  I'm not going to

18   read all of them, but I will mention some.

19        First, you can't commit another federal, state, or

20   local crime.

21        Second, you cannot unlawfully possess or use a

22   controlled substance.

23        Third, you cannot own, possess, or have access to a

24   firearm, ammunition, destructive device, or dangerous weapon.

25        Fourth, you will have to comply with all reporting

1  obligations with the probation office including as to things

2  like where you live, where you work, who you come in contact

3  with, things of that nature.

4        You cannot knowingly associate or communicate with any

5  member of the OMB criminal street gang or any other criminal

6  street gang.

7        You will have to participate in a cognitive behavioral

8  treatment program.

9        You'll have to submit to a mental health evaluation

10  and comply with any recommended treatment.

11        You'll have to participate in a program of testing

12  and/or treatment for substance abuse and follow any recommended

13  treatment.

14        And, finally, you'll have to submit to a search of

15  your person, property, residence, and other effects, including

16  cell phones, iPads, electronic devices, vehicles, things of that

17  nature to be conducted by a probation officer if they have

18  reasonable suspicion to believe you're in violation of the terms

19  of your supervised release.

20        I'm not ordering any restitution in the case.  It's

21  not relevant.

22        I conclude Mr. Gates does not have the ability to pay

23  criminal fines, so I'm not ordering any.

24        Ms. Herrera, is the Government asking for forfeiture

25  in the case?

1          MS. HERRERA:  Yes, Your Honor.  Some of the firearms

2     and other property was handled administratively, but there was a

3     preliminary order of forfeiture entered, I believe, this week.

4     It's at document 137, so we would ask for that to be reflected

5     in the judgment.

6          THE COURT:  Got it.  The final judgment will enter a

7     final order of forfeiture with respect to the firearm or

8     firearms that were reflected in the preliminary order of

9     forfeiture, so that will be part of the judgment as well.

10          I'll also order a special assessment in the amount of

11    $600.  That's $100 per count of conviction.  That's mandatory

12    and due and payable immediately.

13          Ms. Herrera, does the Government have a motion to

14    dismiss to make with respect to certain counts?

15          MS. HERRERA:  Yes, Your Honor.  We would move to

16    dismiss the remaining counts that are pending against this

17    defendant resulting from the superseding indictment, and that

18    would be pursuant to the parties' plea agreement.  I can list

19    them out.

20          THE COURT:  Yeah.  Why don't you go ahead just for

21    clarity of the record.

22          MS. HERRERA:  Yes, Your Honor.  We would move to

23    dismiss Counts 3, 5, 11 through 16, 20, 21, 23, 27, 28, and 30.

24          THE COURT:  All right.  All of those counts will be

25    dismissed.

1          Is there any recommendation, Mr. Brown, you'd like me

2    to make in terms of placement or programming for Mr. Gates?

3          MR. BROWN:  Yes, Your Honor.  Defendant requests

4    recommendation for RDAP and a UNICOR facility such as Sandstone,

5    Minnesota, FCI.

6          THE COURT:  All right.  I'll make both of those

7    recommendations, that he be allowed to participate in RDAP or

8    some other substance abuse program and that he have the UNICOR

9    program made available to him.

10         Is there any geographic request you'd like me to make,

11   Mr. Brown?

12         MR. BROWN:  Midwest region, Your Honor.

13         THE COURT:  All right.  So I'll include Midwest region

14   for location to the extent consistent with security designation

15   and classification.

16         Is there anything else, Mr. Brown, that you think we

17   need to take up before I advise Mr. Gates of his appellate

18   rights?

19         MR. BROWN:  No, Your Honor.

20         THE COURT:  How about you, Ms. Herrera?

21         MS. HERRERA:  No.  Thank you, Your Honor.

22         THE COURT:  All right.  Mr. Gates, you do have the

23   right to appeal the sentence that I've imposed today.  If you

24   wish to appeal, a written notice of appeal has to be filed in 14

25   days with the United States District Court for the Southern

60

1    District of Iowa.  If you cannot afford the costs of an appeal,

2    those costs will be paid for you including the costs of your

3    attorney.

4              With that, this matter is adjourned.  Thank you.

5              (Proceedings concluded at 11:58 a.m.)

6

7

8                        C E R T I F I C A T E
              I, Tonya R. Gerke, a Certified Shorthand Reporter of
     the State of Iowa and Federal Official Realtime Court Reporter
9    in and for the United States District Court for the Southern
     District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.
10   Section 753, that the foregoing is a true and correct transcript
     of the stenographically reported proceedings held in the
11   above-entitled matter and that the transcript page format is in
     conformance with the regulations of the Judicial Conference of
12   the United States.
              Dated at Des Moines, Iowa, April 24, 2024.
13
                        /s/ Tonya R. Gerke
14                      Tonya R. Gerke, CSR, RDR, CRR
                        Federal Official Court Reporter
15

16                           INDEX

17   WITNESS                                      PAGE

18     **JEFFREY GEORGE,** GOVERNMENT WITNESS        9

19    DIRECT EXAMINATION BY MS. HERRERA             9

20    CROSS-EXAMINATION BY MR. BROWN               25

21    REDIRECT EXAMINATION BY MS. HERRERA          37

22   EXHIBITS                                     PAGE

23    Government Exhibits 1 through 9              9

24    Defense Exhibits G1, G2, and G3             38

25